19CA2046 Peo v Larimore 11-10-2021 COLORADO COURT OF APPEALS Court of Appeals No. 19CA2046 Jefferson County District Court No. 19CR439 Honorable Margie L. Enquist, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Joseph Mack Larimore, Defendant-Appellant. JUDGMENT AFFIRMED Division II Opinion by JUDGE YUN Berger and Davidson*, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced November 10, 2021 Philip J. Weiser, Attorney General, Paul Koehler, First Assistant Attorney General, Melody Joy Fields, Assistant Attorney General Fellow, Denver, Colorado, for Plaintiff-Appellee Megan A. Ring, Colorado State Public Defender, Dana Neely, Deputy State Public Defender, Golden, Colorado, for Defendant-Appellant *Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2021. 
1 ¶ 1 Joseph Mack Larimore appeals the judgment convicting him of third degree assault and possession of a controlled substance. We affirm. I. Background ¶ 2 Larimore and the victim, his then-girlfriend, were having a bad day. They had spent a few hours working for a third-party food delivery service, with Larimore driving and the girlfriend picking up and dropping off the orders. But by early afternoon, following an argument over a wrong turn, the couple decided to return to their shared apartment. After arriving there, they found a late-rent notice taped to their door. The couple soon started arguing again — this time about money, about their relationship, and about Larimore’s alcohol use. ¶ 3 Later that evening, the couple’s argument escalated into a physical fight over possession of one of their cell phones.
1 Viewing the evidence in the light most favorable to the verdict, Larimore pushed the girlfriend during the fight, first into the front door and 1 At trial, the evidence diverged as to whose phone was at the center of the struggle: Larimore’s (by then former) girlfriend testified that it was her cell phone, while Larimore testified that it was his cell phone. 
2 later over the back of the couch. He then held her down by sitting on her back and squeezing her neck with his legs. The girlfriend punched and kicked Larimore and screamed for help, drawing the attention of a neighbor who called 911. Larimore eventually let the girlfriend go and, as she was calling 911, left the apartment. ¶ 4 When the police arrived, the girlfriend answered the door with red marks on her neck and the back of her ears, as well as reddening in her eyes. While one of the officers was interviewing the girlfriend, Larimore returned to the apartment. A sergeant took Larimore into the breezeway and patted him down for weapons. While she was doing so, the sergeant found an unlabeled pill bottle containing a sealed, twelve-unit blister pack of clonazepam tablets in the pocket of his hoodie. Larimore was later arrested. ¶ 5 Two days later, the People charged Larimore with (1) second degree assault in violation of section 18-3-203(1)(i), C.R.S. 2021; (2) obstruction of telephone service in violation of section 18-9-306.5(1), C.R.S. 2021; and (3) possession of a schedule III, IV, or V controlled substance in violation of section 18-18-403.5(1), (2)(c), C.R.S. 2021. He pleaded not guilty and proceeded to trial, where the jury acquitted him of the obstruction of telephone service 
3 charge but found him guilty of possessing a controlled substance and the lesser included offense of third degree assault, see § 18-3-204(1), C.R.S. 2021. The court entered judgment of conviction and sentenced Larimore to two years of domestic violence probation. II. Analysis ¶ 6 Larimore makes two arguments on appeal. He contends that the court reversibly erred by limiting his ability to cross-examine the girlfriend and that insufficient evidence supports his conviction for possessing a controlled substance. We address each of his arguments in turn. A. Limits on Cross-Examination ¶ 7 Larimore first contends that, by limiting his cross-examination of the girlfriend about her mental health history, the district court violated his constitutional right to confront the witnesses against him, requiring reversal. We disagree. 1. Additional Background ¶ 8 Before Larimore’s trial began, the prosecutor asked the court to bar the defense from inquiring about the girlfriend’s past suicide attempt. The prosecutor argued that such evidence was irrelevant. 
4 The court agreed, restricting questioning to the girlfriend’s mental state on the day of the offense. Specifically, the court ruled that the defense could ask about whether the girlfriend was upset or depressed that day, whether she drank alcohol, used marijuana, took medication or other drugs that day, and whether she became impaired — but could not ask about her past suicide attempt. 2. Standard of Review and Governing Law ¶ 9 A defendant has the constitutional right to confront and cross-examine the witnesses against him. People v. McFee, 2016 COA 97, ¶ 56 (citing Krutsinger v. People, 219 P.3d 1054, 1061 (Colo. 2009)); see U.S. Const. amends. VI, XIV; Colo. Const. art II, § 16. But this right is neither absolute nor unlimited. McFee, ¶ 56. A district court has discretion “under the Confrontation Clause to impose reasonable limits on cross-examination because of concerns about harassment, prejudice, repetition, or marginal relevance.” Kinney v. People, 187 P.3d 548, 559 (Colo. 2008) (citing Delaware v. Van Arsdall, 475U.S. 673, 679 (1986)). In exercising that discretion, the court “should exclude evidence that has little bearing on credibility, places undue emphasis on collateral matters, or has the potential to confuse the jury.” People v. Knight, 167 P.3d 147, 
5 153 (Colo. App. 2006). “The scope and limits of cross-examination are matters within the sound discretion of the trial court, and absent an abuse of that discretion, we will not disturb the court’s rulings on appeal.” McFee, ¶ 56. 3. Discussion ¶ 10 Larimore argues that the court’s bar on questions about the girlfriend’s past suicide attempt prevented him from impeaching her credibility and thus bolstering his theory of defense: that the girlfriend was “inconsolable and attacked him.” Without this evidence, he asserts, “his ability to cross-examine the prosecution’s key witness” was “significantly prejudiced.” ¶ 11 But “[a] witness’s prior mental health condition is relevant for impeachment purposes only if the witness suffered from the condition close in time to the events at issue.” Id. at ¶ 58 (collecting cases). Thus, in McFee, ¶¶ 55, 57, 62, the division deemed “too remote to be relevant” the fact that a witness had been found incompetent to stand trial three years before the murder and four years before his testimony at trial. The division noted that “McFee did not argue, much less produce evidence tending to show, that [the witness’s] ability to recall events or testify accurately was 
6 compromised because of the earlier incompetency finding.” Id. at ¶ 62; see also People v. Gladney, 194 Colo. 68, 73, 570 P.2d 231, 234-35 (1977) (concluding that the trial court had properly prevented questioning the witness because “[t]he defendant made no offer of proof to demonstrate that the [psychiatric] hospitalization was in any way relevant to the defendant’s credibility three years later at the time of trial”); People v. Norwood, 37 Colo. App. 157, 164, 547 P.2d 273, 279 (1975) (“The mere fact of [a psychiatric] hospitalization for a period of six weeks, three and one-half years before the trial, is too remote to affect, per se, a witness’ credibility.”). ¶ 12 Like the four-year-old incompetency finding regarding the witness in McFee, the fact that the girlfriend attempted suicide at some (unknown) point before the day of the assault was not relevant for impeachment purposes at trial. Larimore claims that he laid an adequate foundation for introducing this evidence because he and the girlfriend “were dating when [the girlfriend] attempted suicide, and Mr. Larimore commented to an officer on the scene that she had been overmedicating with drugs and alcohol since her suicide attempt.” But Larimore never asserted that the 
7 girlfriend attempted suicide “close in time” to the assault; in fact, he did not say when it happened at all. See McFee, ¶ 58. Nor did he explain how the suicide attempt affected the girlfriend’s credibility at trial. Accordingly, the court did not abuse its discretion by precluding the defense from asking about the girlfriend’s past suicide attempt. ¶ 13 We are not persuaded otherwise by Larimore’s contention that this case more closely resembles United States v. Robinson, 583 F.3d 1265 (10th Cir. 2009). In Robinson, 583 F.3d at 1267, 1272, the district court precluded the defense from inquiring about the mental health history of a confidential informant (CI) — “the government’s star witness” — even though the CI had been involuntarily committed to a mental health facility just six days before trial and, at the time of his admission, was abusing drugs, experiencing auditory hallucinations, seeing “things out through the window that are not really there,” and possibly suffering from psychosis. The Tenth Circuit reversed, noting that because of the district court’s restrictions, “the jury saw an incomplete and inaccurate picture of the CI’s credibility.” Id. at 1267. 
8 ¶ 14 By contrast, testimony about the girlfriend’s past suicide attempt would not have given the jury a “significantly different impression” of her credibility at trial. Kinney, 187 P.3d at 559 (A Confrontation Clause violation “is prejudicial when a reasonable jury would have had a ‘significantly different impression’ of the witness’s credibility had the defendant been allowed to pursue the desired cross-examination.” (quoting Van Arsdall, 475 U.S. at 680)). The jury heard testimony that on the day of the assault, the girlfriend (1) argued with and yelled at Larimore; (2) drank alcohol, smoked marijuana concentrate, and took her “mental health medication” while drinking (contrary to the medication’s warning label); (3) felt angry; (4) could not remember important facts about that day, like whether she struck Larimore first; and (5) was unable to calm down and “not really making much sense.” B. Sufficiency of the Evidence ¶ 15 Next, Larimore contends that the evidence presented at trial was insufficient to support his conviction for possessing a schedule III, IV, or V controlled substance. Again, we disagree. 
9 1. Standard of Review and Governing Law ¶ 16 We review sufficiency-of-the-evidence claims de novo. McCoy v. People, 2019 CO 44, ¶ 2. In reviewing such a claim, we look at the entire record to determine “whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt.” Clark v. People, 232 P.3d 1287, 1291 (Colo. 2010) (quoting People v. Bennett, 183 Colo. 125, 130, 515 P.2d 466, 469 (1973)). “It does not matter that, were we the trier of fact, we might have reached a different conclusion.” Id. ¶ 17 Larimore argues, specifically, that the evidence was insufficient to support the charge of possessing a schedule III, IV, or V controlled substance in violation of section 18-18-403.5(1), (2)(c). As pertinent here, according to that statute, “it is unlawful for a person knowingly to possess a controlled substance,” § 18-18-403.5(1), and a person who knowingly possesses “[a]ny material, compound, mixture, or preparation that contains . . . any 
10 quantity of a controlled substance listed in schedule III, IV, or V . . . commits a level 1 drug misdemeanor,” § 18-18-403.5(2)(c). 2. Discussion ¶ 18 The record contains the following evidence showing that Larimore knowingly possessed a schedule III, IV, or V controlled substance: (1) during a consensual search of Larimore’s pocket, an officer found an unlabeled prescription pill bottle in his pocket; (2) Larimore testified that the bottle contained “Klonopin”
2 tablets that he and the girlfriend had found near a creek; (3) the girlfriend testified that another officer told her Larimore had a bottle of pills and that she told the officer she thought the pills were “Klonopin”; (4) the pill bottle contained a labeled blister pack, folded in half and containing twelve tablets, and the jury was allowed to examine both the bottle and the blister pack; 2 Klonopin is a trade name for clonazepam. United States v. Hargrove, 382 F. App’x 765, 773 n.12 (10th Cir. 2010). 
11 (5) because the blister pack was factory-sealed and labeled, the forensic drug chemist did not test the tablets; (6) though the chemist admitted during cross-examination that he could not “a hundred percent say that it is [c]lonazepam,” he explained that when something is “commercially manufactured, we can put in our report that we can presumptively identify that this contains a certain substance based on the packaging”; and (7) the chemist testified that clonazepam is a schedule IV controlled substance. ¶ 19 In our view, this evidence was substantial and sufficient to support a conclusion by a reasonable mind that Larimore was guilty, beyond a reasonable doubt, of possessing a schedule IV controlled substance. See Bennett, 183 Colo. at 130, 515 P.2d at 469. We are not persuaded otherwise by Larimore’s contentions. ¶ 20 First, he asserts that because the chemist never tested the tablets, and because the prosecutor presented no evidence that the tablets resembled clonazepam tablets, no reasonable juror could conclude, beyond a reasonable doubt, that the tablets were clonazepam. But the absence of that evidence did not make it 
12 improper for the jury to infer, based on its own inspection of the label on the blister pack — as well as the testimony outlined above — that the tablets were, indeed, clonazepam, a schedule IV controlled substance. See People v. Donald, 2020 CO 24, ¶ 19 (The substantial evidence “test requires us to give the prosecution the benefit of all reasonable inferences that might fairly be drawn from the evidence.”). ¶ 21 Second, Larimore contends that the chemist offered improper expert testimony when he said that he “simply read the label off the commercially sealed packages” to identify the tablets as clonazepam and that the chemist’s status as an expert “most likely swayed the jury.” But as the People point out, the court sustained Larimore’s objection, struck that testimony, and told the jury, “Ladies and gentlemen, you will get this exhibit. . . . [I]t’s up to you to decide what the packaging is.” Further, at the end of the trial, the court instructed the jury, You are not bound by the testimony of a witness who has testified as an expert; the credibility of an expert’s testimony is to be considered as that of any other witness. You may believe all of an expert witness’s testimony, part of it, or none of it. 
13 The weight you give the testimony is entirely your decision. And we presume that the jury follows the instructions it receives. People v. Flockhart, 2013 CO 42, ¶ 28. III. Conclusion ¶ 22 For these reasons, we affirm the judgment. JUDGE BERGER and JUDGE DAVIDSON concur.